Judge Marshall.
delivered the Opinion of the Courts
The infant children and heirs of John Churchill, deceased, suing by their nest friend, filed this bill against Thomas Akin, the administrator, and Caroline Churchill, the widow, of the decedent, praying for an account and distribution of his estate, and for other appropriate relief.
The complainants are the children of a first wife; after whose death, Churchill married the daughter of Joseph Akin, who, in June, 1828, during the continuance of this marriage, died, leaving a considerable personal estate.
In January, or February, 1830, Churchill died, having had no children by his second wife, who survived him, and is a party to this suit.
In the interval between the death of Joseph Akin and’ that of Churchill, Thomas Akin, the brother and administrator of Joseph, advanced various sums of money to and for Churchill; after whose death, he became his administrator also. And claiming to be the creditor of Churchill, to the extent of these advances, and of an account against him in the store of Thomas and Joseph Akin, terminating a few weeks after the death of the latter—he sold at public auction, and, being the highest bidder, purchased, and retained, in part satisfaction of these claims, all the slaves—four in number—then remaining of the estate of Churchill—the entire personalty having been previously sold, and applied to the payment of other debts.
Whether Thomas Akin was properly the creditor of Churchill, to the extent claimed, or to any extent, and, if a creditor, whether the mode adopted' for the satisfac *476 tion of his debt was legal, are the principal questions presented by the pleadings.
A husband has a right, during his life, to demand and receive any thing that is due to his wife as a distributee, and when received by him, it becomes his property; but upon the death of the husband, all such rights survive to the wife, and constitute no part of his assets. A man died, leaving a considerable personal estate; to a portion of which his married daughter was entitled. The adm’r, before any settlement, or formal distribution of the estate, made sundry advances to her husband, or for his use— taking his notes to himself, as administrator, for some, notes he had given to others, with their assignments, or receipts, on them, to him as adm’r, for some, and orders of the husband, on him as adm’r, for the rest. The husband died, and the adm’r of his wife’s father (her uncle) administered on his estate, also. After the death of the husband, the admin’r of both estates, took the ground, that the notes and orders of the husband thus obtained, were good evidences of debts due from the husband’s estate, to the estate of his wife’s father; and that the interest to which the widow was entitled in her father's estate, surviving to her, was still all due to her—to the exclusion of (the compt’s) the husband’s children by a former wife; and, according to this view, he had made a settlement in the county court, before this bill was filed — by those children, to correct the settlement, &c. But held, that as it does not appear, that there was any foundation for the advances, other than the husband’s claim, in right of his wife, as distributee, they must be deemed to have been payments on that account—being so much of his wife’s interest reduced to possession: not debts due from him — the notes &c. having been taken, rather than receipts, to secure a return of the excess in case the payments should amount to more than the wife was entitled to. And this view is confirmed by the fact, in proof, that the adm’r had admitted, after the husband’s death, that he had made advances to him, on account of his wife’s interest in her father’s estate.
*476 The complainants allege that the sums comprised in this claim were advanced to, and received by, their father, on account of, and as a part of, the interest of his wife in the estate of Joseph Akin, her father; and that it was not until after the death of Churchill, that Thomas Akin, looking to the interest of the widow, his neice, pretended to claim them as constituting a debt to himself individually. These allegations are denied by the defendants; and the administrator refers to, and relies on, a settlement with the County Court, made before the commencement of this suit, in which his claims as a creditor were sanctioned, and which showed a balance still in his favor, greater than the sum at which he purchased the slaves.
In the progress of the suit, Churchill’s widow married William Porter, who was made a defendant, and Akin, the administrator, having died, the suit was revived and carried on against Porter, as his administrator.
On hearing, the bill was dismissed, and the complainants prosecute a writ of error.
The interest of Mrs. Churchill, as a distributee, in her father’s estate, was a chose in action, which, except so far as it was received or reduced into possession by her husband, survived to her upon his death. But it is equally clear that such portion of it as was reduced into possession by him, formed a part of his estate, and could not be the foundation of a claim against it. He had a right to demand and receive from the administrator of Joseph Akin, the distributive share of his wife in the estate of her deceased father. The estate, out of which this share was to be paid, was in the administrator’s hands. Before a final settlement, or any formal distribution, he advances to and for the husband, various sums, amounting to much less in the aggregate than the distributive share of the wife; and no other cause or motive for these advances appears, but the fact of his relation to the estate of which the administrator had the control. The inference plainly and forcibly arising from *477 these facts taken alone, is that the advances were made on account of, and as a part of, the wife’s interest, to which the husband had a right, and which the administrator was bound eventually to pay. It seems, however, that the administrator did not take Churchill’s receipts for these advances, as for so much paid on account of his wife’s interest; but in some cases took his notes"payable to himself as administrator, in other cases took, in the same character, an assignment, or receipt, on Churchill’s notes to other individuals, and, in a few instances, paid money on Churchill’s orders. And as these vouchers (except the orders,) import, not a payment to the obligor, but an obligation on his part to pay, it is contended that they prove, that the money advanced was intended and required to be repaid, and, therefore, that it was not advanced as a part of Mrs. Churchill’s interest in her father’s estate, and cannot be considered as so much of that interest reduced into possession by her husband. But, whatever the vouchers might prove, if nothing were to be considered but what appears on their face, they are not sufficient when taken in connection with the other circumstances of the case, to establish the conclusion contended for. They show that the advances were made out of the estate of Joseph Akin; and as Churchill had an interest in that estate, and it appears clearly that the advances were made because he had such interest, the presumption is, that it was not intended that he should repay them in money, unless it should be found that they were greater the share of Mrs. Churchill in the estate; and that, to provide for this extremely improbable contingency, and to insure the accounting for these advances on proper principles in the final settlement, or merely because the *478 transaction was not final, vouchers were taken in the form of evidences of debt, and not in the form of receipts.
But, besides the presumptions arising from these acknowledged facts of the case, and from others which need not be specially referred to, it is proved by one witness, that Thomas Akin, in consulting with him about the affairs of Churchill, whose administrator he then was, admitted expressly that he had made these advances as a part of the interest of Mrs. Churchill; that even after the death of Churchill, he had not supposed himself to have any demand against his estate on account of them, supposing that they were to come out of the interest of Mrs. Churchill; but that he had been since informed, that as there had been no final settlement in which they had been charged in that way, he must look to Churchill’s estate for them. He also stated to the same witness, that the interest of Mrs. Churchill in her father’s, estate, amounted to two or three times as much as the sums advanced to her husband. And upon this testimony, and the inferences with which it coincides, we consider it as being sufficiently established, that the advances to Churchill were made on account of his wife’s interest in her father’s estate, subject to be refunded so far only as they might be found to exceed that interest. This, in our opinion, was a reduction of so much of the wife’s interest into his possession, and nothing more was necessary to make it his own. If a final settlement of the estate had been made before Churchill’s death, the amount of his wife’s interest would have been ascertained, and the advances made to him, with interest thereon, would have been charged against it, and credited to the administrator; which would have been an extinguishment of the evidences of debt held by him against Churchill. This, according to our construction of the transactions under review, having been their true object and intent from the beginning, the parties had a right, from the beginning, to have it thus carried into effect, whenever the settlement should take place. And this right was not varied or defeated by the death of Churchill before the settlement. The money became *479 his by being advanced to him in right of his wife, and nothing but the exigencies of the estate, from which it proceeded, could make him, or his representatives, an actual debtor for it.
The acceptance of an order is prima facie evidence, that the acceptor has funds of the drawer in his hands; and an order being drawn on one who, as adm’r, held funds in which the drawer had an interest, but no other funds of the drawer, the presumption is, that it was paid out of those trust funds, though it was not addressed to the adm’r as such.
It was improper, therefore, and erroneous to allow credit to Thomas Akin, in his account, as administrator of Churchill, for any sums advanced by him to Churchill, out of the estate of Joseph Akin, while he was administrator of the latter. This error—for which the decree must be reversed and remanded—clearly embraces the credits allowed for two notes executed by Churchill to T. Akin, as administrator of J. Akin—the one for $300, the other for $4.37½, with the interest on each; also, the note of Churchill to Barnet, for $50; his note to Waggoner, for $24, and his note to Miller, for $36.91, with the interest on each; also, his order for $55.56¼ upon T. Akin, as administrator, in favor of Barrett, allowed with interest. And as the acceptance and payment of an order is prima facie evidence that the acceptor is indebted to the drawer, or has funds of his in his hands, we are of opinion that there should have been no credit allowed for the payment of Churchill’s order upon Akin in favor of Lisle—being $120, with interest. Although this order is not addressed to Akin expressly as administrator, the presumption is that it was drawn upon, and paid out of, the estate of Joseph Akin, which was in his hands, and in which the drawer had an interest. It does not appear that he had any other funds of Churchill, or that there was any arrangement between them, which could authorize the order which was paid some months before Churchill’s death. An order for $125.38, in favor of Atwood, and drawn about the same time as the last, stands upon the same ground, if, as is to be inferred from Atwood’s deposition, it was paid during the life of Churchill. If not paid until afterwards, as the receipt upon it imports, it was properly credited to his administrator, by whom it was paid. The true state of the fact may be ascertained on the return of the cause to the Circuit Court, by reference to the original receipt, or by evidence before the commissioner to whom the case must be referred.
An adm’r produces an acceptance of the intestate—on which the drawer had indorsed that it was paid to him, by the adm’r, at such a date; at which date, the acceptor was still living: the adm’r cannot avail himself of this inconsistent certificate, to entitle himself to a credit in his administration accounts; and under the circumstances of the case, it must be placed on the same footing with the notes and orders above.
One other credit (of $65, with interest,) is to be noticed. It was allowed upon an order drawn by J. B. Winston, in favor of the administrators of Joseph Akin, and accepted by Churchill, January 27th, 1829; on which is the following writing: “ Thomas Akin, administrator of John Churchill, deceased, paid the within order to me. John B. Winston. January 27th, 1829.” Churchill did not die until 1830. The writing, therefore, is false, either in its date, or in its description of Akin’s character, and cannot operate as proof in his favor on either point. It does not purport to be a receipt given at the time of the alleged payment, but a mere statement that the payment had been made. Nor does it appear that the person who signed this statement had a right to receive the money. For, although the drawer of an order may, under certain circumstances, have the right to receive the money from the acceptor, that is not the presumed object of an order drawn in favor of a stranger; and taking the order to have been a real transaction, and that, before or after acceptance, it passed out of the hands of the drawer into those of the payee, there is nothing in this case to show why or how the drawer became entitled, afterwards, either to the possession or the proceeds.
The order was doubtless drawn for the purpose of paying a debt from the drawer to Akin’s administrators, by means of a debt due to the drawer from the acceptor, who, in right of his wife, was one of Akin’s distributees. And there is no reason to suppose that the administrators, while they were advancing money to Churchill, and taking up his notes and orders on account of this interest, would have refused to receive this acceptance in payment of a debt to the estate. If this was done, as may be presumed, the transaction would be equivalent to the advance of so much money to Churchill on account of his interest in the estate, and his acceptance remaining in the hands of the administrators, though an evidence of debt against him, would stand on the same ground as his notes assigned to them, and, for the reasons before stated, should have been taken into the account of the estate of Joseph Akin, and *481 charged against the interest of Mrs. Churchill therein; but should not have been allowed as a charge against Churchill’s estate, in the accounts of his administrator. Rejecting the certificate attached to this order as inconsistent, and in other respects incompetent, we are of opinion that the credit of principal and interest allowed for this item, was improper.
A charge in the administrator’s accounts for the amount of a store acc’t, due from the intestate to the adm’r as surviving partner, allowed; as it does not appear, that any arrangement had been made by or with the intestate, to have it satisfied out of his wife’s portion of her father’s estate in the hands of the surviving partner as adm’r of that estate.
An ex’or or administrators cannot buy at his own sale of the decedent’s property. If he has paid out his own money for the estate, he may retain property, at its fair value, in lieu of it; and if, having such right, he bids off property at the sale, it amounts to an election to retain it; but still he must account for it, at its actual value: he cannot have the benefit of any purchase at an under-price.—The accounts of an administrator, as allowed and settled by the county court, showed a large balance in his favor; to pay which he sold all the intestate’s slaves, and became himself the purchaser, for less than the balance due him; but, upon an investigation in this suit, the balance really due, is found to be far less than the value of the slaves. In the mean time, their relative values has changed—some have had issue; some may have died; and it cannot he known which of them would have been selected, if the administrator had retained no more than he was entitled to: held, therefore, that the purchase made by him, must be deemed nugatory, the slaves still the property of the decedent’s estate, for the use of those entitled to them.—The adm’r must also account for the hire, at a reasonable rate, deducting the cost of supporting such as could not support themselves: the net hire to be set off against the debt, and its interest, due the administrator, from the intestate’s estate; for the residue of his debt (if any) he has a lien on the slaves.
On scrutinizing the settlement and vouchers, we perceive no other item of credit to the administrator which we feel authorized to reject. It is quite probable that there was no intention, on the part of Thomas Akin, to urge the payment of the store account of T. and J. Akin against Churchill, until a settlement of the estate of Joseph Akin. But the right to demand it survived to Thomas Akin. It was never assumed by the administrators, and no act was done by any body, which could be construed into an appropriation of any part of Mrs. Churchill’s interest in the estate to its payment or extinguishment, and none which could be construed into an appropriation of the account to the extinguishment of any part of her interest.
It will be proper, however, in correcting the account, to charge the administrator with the sums admitted by him, to have been received since his settlement with the County Court, and to credit him with the amount which may have been paid by him, since the settlement, in discharge of the demands against Churchill’s estate, mentioned in the answer of Porter.
Besides impeaching the settlement, and praying for a correction of it, the complainants also allege, (as before stated,) that the purchase of the slaves of the estate by *482 the administrator, was illegal, and pray that it may be set aside, and for other appropriate relief on that subject.
With regard to the purchase, it is well settled that an executor or administrator cannot purchase at a sale of the decedent’s property, made by himself. But as he has the right to retain property, at its fair value, in payment of a debt due to himself from the estate, his purchase may be considered as an election to retain, where he has the right to retain; and, on that ground, his title might not be disturbed, but he would be held to account for the full value, at whatever nominal price he may have purchased. If, in this case, the administrator had been a creditor of the estate to the amount claimed by him, and if the fair value of the slaves, at the time of sale, had not exceeded that amount, he might have been permitted to retain them. But upon a correction of his accounts, as herein directed, he will be found to have been a creditor to a much less amount than either the fair value of the slaves purchased by him, or the price which he bid for them, and consequently a greater number was sold by him, than he had any right, either to sell, or to retain for his debt.
As he made no selection among them, but wrongfully sold and retained the whole of them, to satisfy a demand of his own against the estate, which was, to a great extent, unfounded—there was, in fact, no election to retain any one or more of them, in exclusion of others, in satisfaction of the amount justly due. The title of the administrator cannot, therefore, be confirmed, as to any of the slaves, on the ground of an actual election to retain. Nor do we perceive any principle on which the Court can, either say for itself, that he might and ought to have elected such or such a slave, and, on that ground, confirm the title as to such one, from the time of the sale, or permit his representative now to make an election, predicated on the condition of things existing at the time of the sale, and to have the effect of confirming the title from that time, as to the individual selected. Some of the slaves have become more valuable, and others less so; some of them have had issue, and some *483 may have died. It would be impossible to lose sight of these facts, in making an election which should have been made in 1831. No selection could now be made, without being influenced, in a greater or less degree, by a knowledge of them, and none could be made with a confidence that it is the same which would or should have been made at the time of the sale, when they were unknown.
Upon surrendering slaves, the adm’r will be entitled to a refunding bond. If any that are living, cannot be produced, their value must be decreed against him. If there is a balance due the administrator, on his accounts, it must be provided for by the decree, with a lien on the slaves to secure it.
There seems, therefore, to be no just alternative, but to regard the sale and purchase of the slaves as wholly illegal and void, and as, therefore, insufficient to confer any right upon the administrator. The consequence of which is, that the slaves, or such of them as are living, still belong, to the estate of Churchill, and should be surrendered to those who are entitled to that estate. And as they have been wrongfully detained by the administrator, he, or his representative, is liable for the fair value of their services, from the time of the sale until they are surrendered up to the rightful owners. The amount of which liability, when properly ascertained, should be set off against the debt due from the estate to the administrator, with the interest thereon up to the time of final adjustment, and the balance should either be decreed against the party against whom it stands, or be set off against some other sum to which that party may be entitled under this opinion.
As Churchill’s administrator, may have believed that he was justly entitled to the whole sum for which he claimed to be the creditor of the estate, and therefore regarded himself as acting correctly in retaining the slaves as his own—it seems proper that, in taking an account of the value of their services, he should only be charged with such profits as a reasonable owner would derive from them, after deducting the cost of maintaining such of them as, in the hands of such an owner; might be deemed incapable of maintaining themselves.
Upon the execution of a proper refunding bond to the administrator of Thomas Akin, the complainants will be *484 entitled to such of the slaves, and their increase, as may be living, and to the value, at the time of the decree, of such of them as, being alive, cannot be surrendered to them; and, also, to such balance as may appear in their favor, on comparing the respective liabilities of the parties, as above directed; but if, upon such comparison, the balance should appear against them, it should be provided for as having a lien upon the slaves. As the complainants have no color of equity against the estate of Joseph Akin, and can have no relief against that estate, it was not necessary for them to bring its representative before the Court.
The decree dismissing the complainants’ bill is, therefore, reversed, and the cause remanded, for the ascertainment of facts as above directed, and for final decree thereon, in conformity with this opinion.